

# Fourth Court of Appeals
## San Antonio, Texas

### OPINION

No. 04-13-00586-CV

**LIBERTY MUTUAL FIRE INSURANCE COMPANY**,
Appellant

v.

**LEXINGTON INSURANCE COMPANY** as Subrogee of DCT Rittiman, LLC,
Appellee

From the 288th Judicial District Court, Bexar County, Texas
Trial Court No. 2012-CI-13972
Honorable John D. Gabriel Jr., Judge Presiding

Opinion by:    Patricia O. Alvarez, Justice

Sitting:        Karen Angelini, Justice
                Patricia O. Alvarez, Justice
                Luz Elena D. Chapa, Justice

Delivered and Filed:  September 30, 2014

REVERSED AND RENDERED

The sole issue in this appeal is whether an "own, rent, or occupy" exclusion in a commercial general liability policy precludes coverage. Appellant Liberty Mutual Fire Insurance Company's policy holder damaged a building insured by Appellee Lexington Insurance Company. Lexington covered the loss. As subrogee, Lexington sued Liberty Mutual. Liberty Mutual asserted its insured occupied the premises and the exclusion applied. Both parties moved for summary judgment, the trial court granted Lexington's motion, and Liberty Mutual appeals. Because we conclude the

exclusion precludes coverage as a matter of law, we reverse the trial court's order and render judgment that Lexington take nothing from Liberty Mutual on Lexington's subrogation claim.

## BACKGROUND

This appeal involves a dispute between two insurance companies. It arises out of an incident causing damage to insured premises used by other parties and entities.

### A. Parties and Entities

#### 1. DCT

DCT Rittiman, LLC owns real property located at 5400 Rittiman Road, San Antonio, Bexar County, Texas. A portion of DCT's property was initially leased by Total Warehousing, Inc.

#### 2. Total

Total Warehousing, Inc. provides management and logistics services to commercial customers. In 2002, Total leased a portion of DCT's property—the premises—from DCT's predecessor lessor. Total leased the premises for, and provided services to, CHEP USA.

#### 3. CHEP

CHEP USA pools and leases to its customers equipment, wooden and plastic containers, pallets, and crates to service its customers' depot facilities. In late 2006, CHEP assumed Total's lease of the premises under an agreement signed by the lessor, CHEP, and Total. As part of their business arrangement, CHEP retained Total to operate its pooling business and manage operations on the premises. At the time of the incident that damaged the premises, Total was insured by Liberty Mutual Fire Insurance Company.

#### 4. Liberty Mutual

Liberty Mutual Fire Insurance Company issued a commercial general liability (CGL) policy to Total for Total's operations on the premises. Liberty Mutual is the appellant.

5.    *Lexington*

The appellee is Lexington Insurance Company.  It insured DCT's property, including the premises.

**B.    Premises**

The premises, as referenced in the lease, comprise "[a]pproximately 78,750 square feet of office/warehouse space located at 5400 Rittiman Plaza in a 126,000 square foot facility."  The office portion of the premises is less than 3,000 square feet; the remainder is warehouse space.

**C.    Incident**

In August of 2008, a Total employee working on the premises struck a warehouse structural support column with a forklift load.  A large section of the building's roof collapsed, and DCT suffered approximately $2.9 million in damages.  Lexington reimbursed DCT for its losses.

**D.    Lawsuit**

Lexington, as DCT's subrogee, sued Liberty Mutual—Total's insurance carrier.  In its declaratory judgment action, Lexington sought a declaration that Liberty Mutual's policy provided coverage for the accident.

Liberty Mutual moved for summary judgment under traditional and no evidence rules; it argued the incident was not a covered loss under Total's policy because of an "own, rent, or occupy" liability exclusion.  It is undisputed that at the time of the incident Total did not own or rent the premises; Liberty Mutual argued Total occupied the premises.

In Lexington's response, it included a cross-motion for summary judgment under traditional and no evidence rules.  Lexington argued the exclusion is not applicable as a matter of law and there is no evidence that Total occupied the property that was damaged.

The trial court granted Lexington's cross-motion for summary judgment, and denied Liberty Mutual's motion.  Liberty Mutual appeals.

**STANDARDS OF REVIEW**

We address the applicable standards of review for competing summary judgment motions in a liability insurance coverage context.

**A.      Traditional Motions**

In a traditional motion seeking summary judgment on a subrogation claim, the subrogee has the burden to establish the existence of a valid policy and coverage for the loss under its terms. *See Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 124 (Tex. 2010) (citing *Ulico Cas. Co. v. Allied Pilots Ass'n*, 262 S.W.3d 773, 782 (Tex. 2008)). *See generally* TEX. R. CIV. P. 166a(c); *accord Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548 (Tex. 1985). "If the [subrogee] proves coverage, then to avoid liability the insurer must prove the loss is within an exclusion." *Gilbert Tex. Constr.*, 327 S.W.3d at 124; *Ulico Cas. Co.*, 262 S.W.3d at 782. If the insurer meets its burden to conclusively prove the policy excludes coverage for the loss, "the burden shifts back to the [subrogee] to show that an exception to the exclusion brings the claim back within coverage." *Gilbert Tex. Constr.*, 327 S.W.3d at 124; *accord Oleksy v. Farmers Ins. Exch.*, 410 S.W.3d 378, 383 (Tex. App.—Houston [1st Dist.] 2013, pet. denied). If the subrogee fails to raise a genuine issue of material fact on whether an exception to the exclusion applies, the insurer is entitled to judgment. *See* TEX. R. CIV. P. 166a(c); *Gilbert Tex. Constr.*, 327 S.W.3d at 124.

**B.      No-Evidence Motions**

Under the no-evidence rule, "[a]fter adequate time for discovery, [either the subrogee or the insurer] . . . may move for summary judgment on the ground that there is no evidence of one or more essential elements of a claim or defense on which [the other] would have the burden of proof at trial." TEX. R. CIV. P. 166a(i); *accord W. Invs., Inc. v. Urena*, 162 S.W.3d 547, 550 (Tex. 2005). Neither the subrogee nor the insurer may properly move for summary judgment on the

ground that there is no evidence of a claim or defense on which the movant has the burden of proof at trial. *See Foreman v. Whitty*, 392 S.W.3d 265, 279 (Tex. App.—San Antonio 2012, no pet.); *see also Urena*, 162 S.W.3d at 550. For example, a subrogee may not obtain no-evidence summary judgment on the ground that the loss is covered under the policy. *See Gilbert Tex. Constr.*, 327 S.W.3d at 124 (subrogee's burden); *Urena*, 162 S.W.3d at 550 (no-evidence motion); *Foreman*, 392 S.W.3d at 279. Conversely, an insurer may not obtain no-evidence summary judgment on the ground that the exclusion precludes coverage. *See Gilbert Tex. Constr.*, 327 S.W.3d at 124 (subrogee's burden); *Urena*, 162 S.W.3d at 550 (no-evidence motion); *Foreman*, 392 S.W.3d at 279.

### C.     Competing Summary Judgment Motions

"When both sides move for summary judgment . . . and the trial court grants one motion and denies the other, reviewing courts consider both sides' summary-judgment evidence, determine all questions presented, and render the judgment the trial court should have rendered." *Gilbert Tex. Constr.*, 327 S.W.3d at 124 (citing *Embrey v. Royal Ins. Co. of Am.*, 22 S.W.3d 414, 415–16 (Tex. 2000)).

### D.     Ambiguity Review

Determining whether an insurance policy is ambiguous and construing an unambiguous policy are questions of law which we review de novo. *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003); *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995); *see Coker v. Coker*, 650 S.W.2d 391, 393–34 (Tex. 1983) (contract construction).

### INSURANCE POLICY AMBIGUITY, CONSTRUCTION

In this appeal, the parties dispute the definition of occupy in an "own, rent, or occupy" exclusion; each moved for summary judgment on their respective definition. Lexington argues in

the alternative that the term occupy as applied is ambiguous. Before we review the summary judgment evidence, we first determine whether occupy is ambiguous as we construe the policy.

## A.     Policy Ambiguity

If the parties disagree about the meaning of certain terms in an insurance policy, the policy is not ambiguous "simply because the parties offer conflicting interpretations" of the policy. *Schaefer*, 124 S.W.3d at 157 (citing *Kelley–Coppedge, Inc. v. Highlands Ins. Co.*, 980 S.W.2d 462, 464 (Tex. 1998)). "If policy language is worded so that it can be given a definite or certain legal meaning, it is not ambiguous and we construe it as a matter of law." *Id.*; *accord Nat'l Union Fire Ins.*, 907 S.W.2d at 520. "An ambiguity exists only if the [policy] language is susceptible to two or more reasonable interpretations." *Schaefer*, 124 S.W.3d at 157 (citing *Kelley–Coppedge*, 980 S.W.2d at 465).

## B.     Policy Construction

"[Reviewing courts] interpret insurance policies in Texas according to the rules of contract construction." *Id.*; *accord Gilbert Tex. Constr.*, 327 S.W.3d at 126; *Kelley-Coppedge*, 980 S.W.2d at 464. We give "[t]he policy's terms . . . their ordinary and generally-accepted meaning unless the policy shows the words were meant in a technical or different sense." *Gilbert Tex. Constr.*, 327 S.W.3d at 126. We read all the policy's provisions together searching for a reasonable construction that gives every provision meaning and renders no provision meaningless. *Id.*; *Schaefer*, 124 S.W.3d at 157.

With these principles in mind, we turn to the language of the CGL policy and the exclusion at issue.

POLICY LANGUAGE

Liberty Mutual issued a CGL policy to Total with a per occurrence limit of $1 million for bodily injury and property damage. The coverage provision and the exclusion at issue here read as follows:

1. Insuring Agreement

   a. We will pay those sums that [Total] becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. . . .

      . . .

2. Exclusions

   This Insurance does not apply to:

   . . .

   (j) Damage [t]o Property

   "Property damage" to:

   (1) Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

      . . .

   (5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; . . . .

ANALYSIS

Before we can determine whether summary judgment was proper, we must construe the policy's terms regarding coverage and any applicable exclusions.

**A.      Coverage**

The parties agree on the core facts regarding coverage. They agree Liberty Mutual issued a CGL policy to Total, the policy was in effect when the incident occurred, and Total's employee was responsible for the damage to the structural support column. Thus, under the policy, Liberty

Mutual was obligated to pay for the damage caused by Total's employee unless an exclusion applied to preclude coverage.

## B.     Exclusions

Policy paragraph 2(j)(1) excludes from coverage property damage to "property you own, rent, or occupy." The parties also agree on the following facts regarding the exclusions:

- Total did not own or rent the premises,
- Total was authorized to be on the premises, and
- Total was conducting operations on the premises under its agreement with CHEP and within the scope of the lease's permitted uses of the premises.

The parties disagree on whether Total's presence and operations on the premises met the exclusion's definition of occupy and whether Total occupied the property that was damaged. To support its judgment, the trial court necessarily concluded Total did not occupy the premises, Total did not occupy the roof, or both. We first review de novo the trial court's construction of occupy.

## C.     Parties' Constructions of Exclusion

The policy does not define the term "occupy," and the parties offer conflicting constructions of the term.

Liberty Mutual asserts *Kelley-Coppedge* defined occupy as "to hold or keep for use." *See Kelley-Coppedge*, 980 S.W.2d at 467. It argues Total met both of what Liberty Mutual asserts are occupy's elements: a continued physical presence and control of the property for the insured's own benefit.

Lexington argues that even a substantial physical presence on, or use of, the property is not occupancy. It insists occupancy requires the actor to have the exclusive right of possession to the premises. It contends *Kelley-Coppedge* as applied in this case provides two conflicting interpretations of the term occupy, and thus an ambiguity exists. Consequently, Lexington urges this court to adopt Lexington's definition of occupy in light of the contra-insurer rule. *See State*

*Farm Fire & Cas. Co. v. Vaughan*, 968 S.W.2d 931, 933 (Tex. 1998); *Charida v. Allstate Indem. Co.*, 259 S.W.3d 870, 873 (Tex. App.—Houston [1st Dist.] 2008, no pet.).

We turn to *Kelley-Coppedge*.

**D.**  ***Kelley-Coppedge, Inc. v. Highlands Insurance Co.***

In *Kelley-Coppedge, Inc. v. Highlands Insurance Co.*, the court held the word occupy was unambiguous in the context of a pollution exclusion in a CGL policy.  980 S.W.2d at 467.  *Kelley-Coppedge* dealt with a pollution exclusion in paragraph f.(1).  The exclusion precluded coverage for the following:

> "Bodily injury" and "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants;
>
> > (a) At or from any premises, site or location which is or was at any time owned or ***occupied by***, or rented or loaned to, any insured;
> >
> > . . .
> >
> > (d) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations:
> >
> > > (i)  If the pollutants are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor;

*Id.* (emphasis added).  Subparagraph f.(2) excluded coverage for the following:

> Any loss, cost or expense arising out of any
>
> > (a) Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants . . . .

*Id.*

The dispute in *Kelley-Coppedge* turned on whether the term "occupied by [the insured]" contained in f.(1)(a) of the policy excluded cleanup costs sustained by the insured when the insured's activities of lying pipe along an easement resulted in a spillage.  In formulating the definition of occupy, the court examined two cases to illustrate the difference between a transient

use and occupancy. *Id.* The first case dealt with a pollution exclusion similar to that in *Kelley-Coppedge*.

> *1.* United States Fidelity & Guaranty Co. v. B & B Oil Well Service, Inc.

In *B & B Oil Well Service*, a contractor was reworking oil wells and performing only occasional, limited work on the owners' sites. *See U.S. Fid. & Guar. Co. v. B & B Oil Well Serv., Inc.*, 910 F. Supp. 1172, 1178 (S.D. Miss. 1995). The court stated that occasional and limited work performed by a subcontractor at well sites operated and controlled by others does not amount to occupancy. *Id.* The court opined that "if any sort of occupancy, 'no matter how transitory or for whatever purpose,' were deemed sufficient to invoke subsection (a) of this pollution exclusion, 'the remaining subsections, (b) through (d), would be meaninglessly superfluous.'" *Id.* (quoting *Schumann v. New York*, 610 N.Y.S.2d 987, 991 (N.Y. Ct. Cl. 1994)). It added that "each aspect of the 'occupancy' definition suggests something other than a transient, nonpossessory relation to the property." *Id.*

*Kelley-Coppedge* then contrasted *B&B Oil Well Service* with *Gregory v. Tennessee Gas Pipeline Co.*, 948 F.2d 203 (5th Cir. 1991).

> *2.* Gregory v. Tennessee Gas Pipeline Co.

In *Gregory*, riparian rights owners sued the City of Natchitoches, Louisiana for the effects of "pollutants at or from the lake." *Id.* at 205, 207. The City claimed that while it owned the lake bed, it did not own "the waters, fish, flora, or fauna of the lake." *Id.* at 205. The Fifth Circuit reasoned that because the City "created the lake, owns at least a large portion of the bed, and maintains and uses the lake and its waters for a drinking water supply," the City occupied the lake. *Id.* at 207. The Fifth Circuit then defined occupy as "to hold or keep for use." *Id.*

After reviewing these cases, *Kelley-Coppedge* also defined occupy as "to hold or keep for use," *Kelley-Coppedge*, 980 S.W.2d at 467, and approvingly recited the following:

> Construed in its ordinary sense and given its intended meaning, the word "occupy" suggests . . . continued physical presence [on the premises]. This exclusion is intended to deprive an insured from the benefit of coverage for damages it causes while "occupying" the [premises]. Plaintiff's occasional trips to the [premises] to make minor improvements do not suggest that it "occupied" the damaged property within the intent of the exclusion and at the time of the loss.

*Id.* at 466 n.1 (alterations in original) (quoting *C.O. Falter, Inc. v. Crum & Forster Ins. Cos.*, 361 N.Y.S.2d 968, 974 (Sup. Ct. 1974)). After it established that physical presence was necessary, *Kelley-Coppedge* addressed the insured's argument that if any presence, no matter how transitory, constituted occupancy under section f.(1)(a), then subsection f.(1)(d) would be meaningless. *Id.* at 467. The court agreed and concluded as follows:

> Subparagraph (a) applies to releases at or from premises *owned or controlled by the contractor*. Subparagraph (d) broadens the scope of the exclusion to include releases at or from premises owned by a third party at which the contractor is performing operations, **but only if** the contractor brings the pollutants onto the site. . . .
>
> A reading that does give meaning to both provisions is that section *f.(1)(a) refers to operations on premises owned or controlled by the contractor*, while section f.(1)(d) refers to operations taking place on a third-party's premises. This reading is consistent with the plain, ordinary, and generally accepted meaning of "occupied" when read in context with the other terms in the clause, "owned," "rented," and "loaned."

*Id.* (first and third emphases added). Thus, in addition to a requirement for a continued physical presence on the premises, the court construed f.(1)(a) to require the insured to have some ownership or control over the premises. The court concluded: "We hold that the term 'occupied by' in this insurance policy's pollution exclusion clause does not encompass [the insured's] operations on *a third-party's premises.* The provision unambiguously excludes costs for pollution spillage from or on the *insured's own premises.*" *Id.* (emphases added).

**E.**     **Ambiguity of Occupy under *Kelley-Coppedge***

Lexington argues *Kelly-Coppedge*'s holding created two competing definitions of the term occupy, and under the contra-insurer rule, we must adopt its interpretation. *See Kelley-Coppedge*, 980 S.W.2d at 467. We disagree.

*Kelley-Coppedge* is clear: an insured using the property for its own benefit—rather than merely conducting operations on the property for the benefit of the owner—distinguishes the occupancy exclusion (exclusion f.(1)(a)) from the operations exclusion (exclusion f.(1)(d)). *Id.* ("By negating coverage for a contractor's entire operations at a job site, the court of appeals' interpretation leaves section f.(1)(d) nothing to exclude."). *Kelley-Coppedge* was dealing with the entire f.(1)(a) exclusion. In the exclusion at issue there, occupy was accompanied by the words "owned," "rented," and "loaned." *Id.* Considering the words together, the court determined the exclusion was applicable to "premises *owned or controlled by the contractor.*" *Id.* (emphasis added).

Applying *Kelley-Coppedge*, we conclude Lexington's proposed definition for "occupy" that requires both legal ownership and exclusive control over the premises would impermissibly render the words own and rent in exclusion (j)(1) meaningless. *See id. Kelley-Coppedge* only requires control over the premises for the insured's own benefit. Like *Kelley-Coppedge*, we conclude our interpretation "is consistent with the plain, ordinary, and generally accepted meaning of 'occup[y]' when read in context with" the words "own" and "rent." *Id.*; *accord Mid-Continent Cas. Co. v. JHP Dev., Inc.*, No. Civ.A.SA04CA-192-XR, 2005 WL 1123759, at *6 (W.D. Tex. Apr. 21, 2005), *aff'd*, 557 F.3d 207 (5th Cir. 2009) (quoting *Kelley-Coppedge*, 980 S.W.2d at 467).

**F.**     **Occupy in Policy is Unambiguous**

Having reviewed the policy and the applicable law, we conclude the term occupy as used in the CGL policy at issue is unambiguous. *See Kelley-Coppedge*, 980 S.W.2d at 467. Following

*Kelley-Coppedge*, we hold that occupy comprises (1) a continued physical presence on the premises, and (2) control of the premises for the insured's own benefit. *See id.*; *Gregory*, 948 F.2d at 207; *Mid-Continent Cas. Co.*, 2005 WL 1123759, at *6.

SUMMARY JUDGMENT MOTIONS

Both Liberty Mutual and Lexington filed traditional and no-evidence motions for summary judgment. The trial court denied Liberty Mutual's motions and granted Lexington's. We begin by reviewing Liberty Mutual's no-evidence motion.

## A.     Liberty Mutual's No-Evidence Motion

In its motion, Liberty Mutual stated it relied on both the traditional and no-evidence standards. However, Liberty Mutual was only entitled to a no-evidence summary judgment if it identified elements of Lexington's cause of action on which there was no evidence and for which Lexington had the burden of proof at trial. *See* TEX. R. CIV. P. 166a(i); *Urena*, 162 S.W.3d at 550.

Although Lexington had the burden to prove a policy existed, the policy covered the loss, and if an exclusion applied, an exception to the exclusion, *see Gilbert Tex. Constr.*, 327 S.W.3d at 124, it was Liberty Mutual who offered the policy—which shows coverage—as part of its summary judgment evidence. Further, Liberty Mutual did not assert there was no evidence of any exception to the exclusion. Thus, Liberty Mutual was not entitled to summary judgment on the grounds that there was no evidence of coverage or an exception to the exclusion—issues for which Lexington would have the burden of proof at trial. *See* TEX. R. CIV. P. 166a(i); *Urena*, 162 S.W.3d at 550. Thus, the trial court did not err in denying Liberty Mutual's no-evidence motion for summary judgment.

## B.     Lexington's Cross-Motion for Summary Judgment

In Lexington's cross-motion, it sought summary judgment under the no-evidence and traditional rules.

As grounds for its no-evidence motion, Lexington asserted three key points: Liberty Mutual had the burden to prove the own, rent, or occupy exclusion applied; the parties agreed Total did not own or rent the premises; and, there was no evidence that Total occupied the damaged property. Specifically, Lexington contended there was no evidence that Total's operations on the premises constituted occupancy, and there was no evidence that Total occupied the damaged property—the roof.

In its traditional motion, Lexington argued the evidence shows as a matter of law that Total did not occupy the damaged property; it did not assert any exception to the exclusion. We address each of the grounds for summary judgment set forth in Lexington's combined and Liberty Mutual's traditional motions.

### 1. *Lexington's Grounds, Liberty Mutual's Traditional Ground*

Lexington's grounds and Liberty Mutual's traditional ground involve the same facts and law; we discuss the facts and grounds together but separately apply the applicable summary judgment standards. *See* TEX. R. CIV. P. 166a(c) (traditional); *id.* R. 166a(i) (no evidence).

Lexington does not dispute the existence or validity of the lease agreement or the assignment, or the fact of Total's operations on the premises. Instead, Lexington contends (1) there is no evidence that Total's operations on the premises constitute occupancy of the damaged property, *see* TEX. R. CIV. P. 166a(i), and (2) the evidence shows as a matter of law that Total did not occupy the damaged property, *id.* R. 166a(c).

Liberty Mutual argues there are no genuine issues of material fact, it conclusively proved it occupied the premises, including the roof, and it is entitled to judgment as a matter of law. *See id.*

We review the summary judgment evidence and apply the applicable law concerning Total's operations on the premises.

## 2. *Total Held or Kept the Premises for Its Use*

As part of its summary judgment evidence, Liberty Mutual provided the 2002 lease between Total and DCT's predecessor lessor. The lease provides that Total "shall use the Premises primarily for the purpose of operating a third-party logistics facility, including a pallet and returnable plastic container refurbishment center which includes the shipping, receiving, painting, and storage of such pallets and containers, and secondarily for such uses as are permitted in Landlord's commercially reasonable judgment." The lease also provides that it is assignable by Total to CHEP at any time.

Liberty Mutual also submitted the 2006 lease assignment from Total to CHEP which was signed by Total, CHEP, and DCT's predecessor lessor. These documents are not only some evidence, but also conclusively prove Total had a contractual right be on the premises to conduct its business operations as the tenant's (CHEP's) agent. As CHEP's agent, Total exercised CHEP's possessory rights to the premises. *Cf. Travis Cent. Appraisal Dist. v. Signature Flight Support Corp.*, 140 S.W.3d 833, 841 (Tex. App.—Austin 2004, no pet.) ("'An ownership interest in a leasehold is the legal right to possess that property for a set period of time . . . [and] to possess the property under the terms of the lease." (first alteration in original) (quoting *Panola Cnty. Appraisal Dist. v. Panola Cnty. Fresh Water Supply Dist. No. One*, 69 S.W.3d 278, 284 (Tex. App.—Texarkana 2002, no pet.)).

The lessor, under the assigned lease, and CHEP, under the operating agreement, retained some rights to enter onto the premises under certain conditions, e.g., tenant default, inspections, hazardous waste remediation, facility maintenance, etc. Otherwise, Total generally controlled access to the premises. It could grant its employees and third parties permission to enter the premises. *Cf. id.* It could keep others out of the premises. *Cf. id.*

We conclude Liberty Mutual not only met its burden to provide some evidence that it occupied the premises, its evidence conclusively proved Total held or kept the premises for its use. *See Gilbert Tex. Constr.*, 327 S.W.3d at 124 (burden); *Kelley-Coppedge*, 980 S.W.2d at 467 (occupancy). Thus, as a matter of law, Total occupied the premises. *See Kelley-Coppedge*, 980 S.W.2d at 467. We turn to the second aspect of Lexington's grounds—that Total did not occupy the property that was damaged.

### 3. *Use of Premises Includes Use of Roof*

Lexington argues that even if we accept Liberty Mutual's construction of the term occupy, Total did not occupy the roof because the roof was not part of the premises and neither CHEP nor Total was "delegated control or use of the roof." Lexington's argument necessarily fails because the lease expressly anticipates and authorizes Total's use of the ceiling and roof.

#### a. Lease section 7.1

Lease section 7.1 states "Landlord shall not be responsible for the following: (i) any roof penetrations caused by or installed for Tenant's operation[s or any] damage to the roof, exterior walls, and/or foundation resulting from the negligent act or acts, or omissions of Tenant."

#### b. Lease section 9.1

Lease section 9.1 addresses prior consent for alterations and fixtures. It reads in pertinent part as follows: "Tenant shall have the right to make non-structural alterations, additions or improvements to the Premises without the necessity of obtaining Landlord's consent [for such changes costing $25,000 or less]." These changes expressly include "[a]ny alteration, improvement, modification or fixture which is installed by . . . Tenant on the Premises and which is in any manner attached to the floors, walls or ceilings."

c.      Lease section 9.2

Lease section 9.2 provides that "all normal trade fixtures, equipment, shelves, machinery and fixtures installed in the Premises at the cost of Tenant . . . may be removed by Tenant."

Reading the lease and the assignment as a whole, we conclude all three signatories—the lessor, CHEP, and Total—understood Total's permitted use of the premises might cause it to install fixtures, equipment, machinery, or the like to support its operations on the premises. Each understood these anticipated alterations included attaching items to the ceiling, penetrating the roof, and mounting equipment to the roof and ceiling. Although the lessor retained overall control of the roof and was responsible for its maintenance, the lease expressly allowed Total to use the ceiling and roof as needed for Total's operations, and that right of use continued for the entire period of the lease. Thus, Total had a right to a continued physical presence for its equipment on, under, or otherwise attached to the roof.

## CONCLUSION

Under *Kelley-Coppedge*, the term "occupy"—in an "own, rent, or occupy" exclusion in a commercial general liability policy that does not otherwise define occupy—means "to hold or keep for use." We hold that "occupy" comprises (1) a continued physical presence and (2) control of the premises for the insured's own benefit.

Having reviewed the summary judgment evidence de novo, we conclude Liberty Mutual proved as a matter of law that Total occupied the premises, including the roof, at the time of the incident, and the exclusion precludes coverage. Therefore, the trial court erred when it granted Lexington's cross-motion for summary judgment.

We reverse the trial court's order and render judgment that Lexington take nothing from Liberty Mutual on Lexington's subrogation claim.

Patricia O. Alvarez, Justice